**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

MEI PING (BARBARA) MATSUMURA; and CARL MILNER, AS TRUSTEE OF THE TRUST U/W/O ARTHUR CUTLER,

Plaintiffs,

v.

BENIHANA NATIONAL CORPORATION; and HARU HOLDING CORPORATION,

Defendants.

CASE NO. 06 CV 7609 (NRB/DFE)

Electronically Filed

Oral Argument Requested

**DEFENDANTS BENIHANA NATIONAL CORPORATION AND HARU HOLDING CORPORATION'S REPLY MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

Alan H. Fein (AF - 5569)
Adam M. Schachter (AS - 5848)
STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.
Museum Tower, Suite 2200
150 West Flagler Street
Miami, Florida 33130
(305) 789-3200

*Attorneys for Defendants Benihana National Corporation and Haru Holding Corporation*

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES . . . . . . . . . . ii

I. INTRODUCTION . . . . . . . . . . 1

II. LEGAL ARGUMENT . . . . . . . . . . 2

A. BNC is Entitled to Summary Judgment on the Breach of Contract Claim . . . . . . . 2

1. BNC Did Not Breach Section 11.1 of the Stock Purchase Agreement . . . . 2

2. BNC Did Not Breach the Stockholders' Agreement . . . . . . . . . . 3

B. BNC is Entitled to Summary Judgment on the Fiduciary Duty Claim . . . . . . . . . . 4

1. BNC Accounted for Haru's Debt in a Manner Consistent with GAAP . . . . 4

2. Pre-Closing, BNC Did Not Owe a Fiduciary Duty to Plaintiffs . . . . . . . . . 9

III. CONCLUSION . . . . . . . . . . 10

CERTIFICATE OF SERVICE . . . . . . . . . . 12

## TABLE OF AUTHORITIES

Page

**Cases**

*Adler v. Wal-Mart Stores, Inc.*,
144 F.3d 664 (10th Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Aspilaire v. Wyeth Pharm., Inc.*,
No. 07cv0952, 2009 WL 988648 (S.D.N.Y. Mar. 30, 2009).. . . . . . . . . . . . . . . . . . . . . . . 5

*Carlson v. Hallinan*,
925 A.2d 506 (Del. Ch. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Chandler v. James*,
985 F. Supp. 1094 (M.D. Ala. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Cooper Development Co. v. Friedman*,
No. 92cv7572, 1994 WL 62846 (S.D.N.Y. Feb. 22, 1994). . . . . . . . . . . . . . . . . . . . . . . . 8

*CSI Inv. Partners II*, *L.P. v. Cendant Corp.*,
507 F. Supp. 2d 384 (S.D.N.Y. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Flores v. Harbor Shipping & Trading Co.*,
No. 01cv0738, 2001 WL 740509 (E.D. La. Jun. 29, 2001). . . . . . . . . . . . . . . . . . . . . . . . . 4

*In re Access Cardiosystems, Inc.*,
No. 05-4076, 2009 WL 1044869 (Bankr. D. Mass. Apr. 17, 2009). . . . . . . . . . . . . . . . . . . 9

*In re Adelphia Commc'n Corp.*,
368 B.R. 140 (S.D.N.Y. 2007).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*In re Louis Frey Co., Inc.*, No. 06cv7587,
No. 06cv7587, 2007 WL 924206 (S.D.N.Y. Mar. 26, 2007).. . . . . . . . . . . . . . . . . . . . . . . 9

*In re Michaels Stores, Inc. Sec. Litig.*,
No. 03cv0246, 2004 WL 2851782 (N.D. Tex. Dec. 10, 2004). . . . . . . . . . . . . . . . . . . . . . 5

*In re Rockville Orthopedic Assocs., P.C.*,
377 B.R. 438 (Bankr. D. Conn. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*In re Wet-Jet Int'l, Inc.*,
235 B.R. 142 (Bankr. D. Mass 1999).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Manhattan Motorcars, Inc. v. Automobili Lamborghini, S.P.A.*,
244 F.R.D. 204 (S.D.N.Y. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Matsumura v. Benihana National Corp.*,
542 F. Supp. 2d 245 (S.D.N.Y. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 7, 10

*McGuire v. Schneider, Inc.*,
534 A.2d 115 (Pa. Super. Ct. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Trans-Orient Marine Corp. v. Star Trading & Marine, Inc.*,
925 F.2d 566 (2d Cir. 1991).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*U.S. v. Rigas*,
490 F.3d 208 (2d. Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

**Rules**

Rule 56.1(b), Local Rules of the United States District Courts
for the Southern and Eastern Districts of New York. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Defendants Benihana National Corporation ("BNC") and Haru Holding Corporation ("Haru Holding") respectfully submit this reply memorandum of law in support of their motion for summary judgment.

## I. INTRODUCTION

Defendants' motion for summary judgment set forth undisputed facts establishing, as a matter of law, that there is no basis for any aspect of Plaintiffs' remaining two claims against BNC for breach of contract and breach of fiduciary duty.[1/]

Plaintiffs begin their defense of these two claims by effectively admitting that the claims cannot be as broad as they pled them. Plaintiffs' opposition memorandum begins by suggesting "the Court in 2008 may have inadvertently conflated two separate allegations and thereby expanded plaintiffs' claims beyond what was intended." Plaintiffs' Response at 2-3. Thus, although the Amended Complaint clearly attacks the imposition of any and all debt in the Put Price formula, Plaintiffs now insist that their claims are limited to the inclusion of "(1) the purchase price and legal and investment banking fees, and (2) the construction costs of late-built and late-opened restaurants" in "Amount of Company Debt." Plaintiffs' Response at 4.

Neither of these newly limited sub-claims can survive. As for including the purchase price in "Amount of Company Debt," it remains undisputed that this treatment is not only permitted by GAAP, but — as Plaintiffs themselves note in their memorandum — is the *encouraged* treatment under GAAP. *See* Plaintiffs' Response at 7.

As to the "construction costs of late-built and late-opened restaurants," it is undisputed that there is nothing in any agreement distinguishing between "late-built" or "earlier built" restaurants; there is no plausible argument that this could represent a breach of either the Stockholders' Agreement or the Stock Purchase Agreement. Nor is there a plausible argument that BNC's refusal

---

[1/] Indeed, in direct contravention of Local Rule 56.1(b), Plaintiffs did not even bother to respond to more than half of Defendants' statements of material fact in support of their motion for summary judgment. *See* Local Rules of the United States District Courts for the Southern and Eastern Districts of New York, Rule 56.1(b) ("The papers opposing a motion for summary judgment *shall include a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party*") (emphasis in original).

to effectively write such a distinction into the agreements could somehow represent a breach of fiduciary duty.

Plaintiffs' principal breach of contract claim continues to be that BNC breached Section 11.1 of the Stock Purchase Agreement — an agreement that has absolutely nothing to do with the very Put Option underlying Plaintiffs' lawsuit, and to which neither Defendant Haru Holding nor Plaintiff Milner are even a party. As shown below, this Court's initial skepticism[2/] regarding this most indirect contract theory was well justified. The remainder of the contract based claim is shown below to be equally infirm.

Nor can Plaintiffs save their case by relying on the breach of fiduciary count. Plaintiffs' suggestion that there are "*pre-closing* breaches of fiduciary duty" that "should be resolved at trial" is without merit, given the Court's conclusion that there was no fiduciary relationship prior to closing. *See Matsumura v. Benihana National Corp.*, 542 F. Supp. 2d 245, 259 (S.D.N.Y. 2008). As for Plaintiffs' claim of *post*-closing breaches of fiduciary duty, Plaintiffs cite no authority to support a fiduciary duty claim based on actions otherwise permissible under a stockholders' agreement. In fact, as shown below, all the law is to the contrary.

For these reasons, summary judgment should be granted in favor of BNC.

## II. LEGAL ARGUMENT

### A. BNC is Entitled to Summary Judgment on the Breach of Contract Claim.

#### 1. BNC Did Not Breach Section 11.1 of the Stock Purchase Agreement.

It speaks volumes that Plaintiffs' primary breach of contract argument is based, not on the language of the Stockholders' Agreement containing the Put Option, but rather on a boilerplate closing provision in another document, the earlier written Stock Purchase Agreement ("SPA"). The purpose and effect of the SPA — a contract to which neither Plaintiff Carl Milner nor Defendant Haru Holdings is a party — was to effectuate the sale of 80% of Plaintiff Matsumura and non-party Wang's stock to BNC, and to supply the terms of closing. *See* SPA at 2, Recital D (BNC 0011).

---

[2/] As the Court noted when Plaintiffs' counsel began to discuss the Section 11.1 theory at oral argument on the motions to dismiss: "You really want to argue that covers borrowed funds? . . . It is in a miscellaneous standard language section, right?" *See* Transcript of Oral Argument on Motion to Dismiss at 28 (Dec. 19, 2007).

Plaintiffs now continue to argue, unconvincingly, that Section 11.1 of the SPA somehow rewrites the Put Option formula contained in the later written Stockholders' Agreement between different parties. Putting aside Plaintiff Milner's utter lack of standing to pursue a claim based on a breach of the SPA,[3] the SPA cannot save Plaintiffs' claims.

The wholly unremarkable Section 11.1 is a closing costs provision. As set forth in Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion to Summary Judgment (which is hereby incorporated by reference), there is absolutely no record evidence from which to conclude that the parties "agreed" the SPA's reference to routine transactional expenses would be read to include the actual purchase price of Haru. *See* Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for Summary Judgment at 6-9. In fact, not only is there a complete dearth of record evidence to support any conceivable breach of Section 11.1 by BNC, there is also nothing to even remotely suggest that the August, 1999 SPA could somehow control the manner in which BNC could calculate, in 2005, the Put Option set forth in the December, 1999 Stockholders' Agreement. As a result, this Court should grant BNC's motion for summary judgment with respect to their claim that BNC breached Section 11.1 of the SPA.[4]

2. <u>BNC Did Not Breach the Stockholders' Agreement.</u>

Plaintiffs fare no better in attempting to defend their breach of contract count based upon the agreement that actually contains the Put Option. Under the Stockholders' Agreement, BNC was

[3] It is well-settled that "[o]nly parties to a contract have standing to assert a claim for breach of contract. Without a contractual relationship, there cannot be a contractual remedy." *CSI Inv. Partners II, L.P. v. Cendant Corp.*, 507 F. Supp. 2d 384, 412-13 (S.D.N.Y. 2007) (citations omitted). Plaintiff Carl Milner is not a party to the SPA, and therefore has no standing to pursue a claim based on a breach of the SPA.

[4] Plaintiffs' Section 11.1 argument is further doomed by the fact that the December, 1999 Stockholders' Agreement contains a merger clause that is controlling over the August, 1999 SPA. The merger clause in the Stockholders' Agreement merges all prior and oral representations into the written executed document. *See Carlson v. Hallinan*, 925 A.2d 506, 523 n. 108 (Del. Ch. 2006) (quoting *McGuire v. Schneider, Inc.*, 534 A.2d 115, 117 (Pa. Super. Ct. 1987)) ("[a]lleged prior or contemporaneous oral representations or agreements concerning subjects that are *specifically dealt with* in the written contract are merged in or superseded by that contract") (internal quotations omitted).

permitted to "push-down" the purchase price to Haru. BNC's accounting in this respect was in accordance with GAAP, which is precisely what the Stockholders' Agreement requires.[5]

BNC was also allowed to deduct the cost of restaurant construction — whether the restaurants were "earlier built" or "late built" as Plaintiffs now attempt to categorize them. The Stockholders' Agreement definition for the term "Amount of Company Debt" is unquestionably broad, using such phrases such as "total of all indebtedness" and "including, *without limitation*, indebtedness to stockholders of the Company." (emphasis added). There is no record evidence from which the Court could conclude that the cost of any restaurant construction was to be excluded from "Amount of Company Debt."

**B. BNC is Entitled to Summary Judgment on the Fiduciary Duty Claim.**

1. <u>BNC Accounted for Haru's Debt in a Manner Consistent with GAAP.</u>

It remains undisputed that BNC accounted for the Haru purchase in a manner permitted by GAAP. In fact, as Plaintiffs' memorandum notes, GAAP actually *encourages* the use of push-down

---

[5] BNC also has noted that even if "push-down accounting" were not clearly permissible under the Stockholders' Agreement, and the Court were to look at parol evidence, the undisputed record reflected Mr. Schwartz's testimony that the parties agreed to this treatment. Plaintiffs' counter by citing to Mr. Milner's testimony that, according to Plaintiffs, "directly contradicts Schwartz." Plaintiffs' Response at 10 (citing Milner Depo. at 48). Plaintiffs, however, fail to direct the Court to the next page of Mr. Milner's testimony, where Mr. Milner is asked whether he did not recall the conversation, or whether he was affirmatively testifying that it did not happen (thereby clearly contradicting Mr. Schwartz). *See* Milner Depo. at 49. Mr. Milner could not bring himself to contradict Mr. Schwartz, stating instead that he "didn't recall any conversations of that nature," and adding he was "almost sure" there were none. *Id.* This was consistent with Mr. Milner's inability to remember anything with conviction. Courts have refused to accord any weight to a party's assertion that he does not remember and, rather, hold these statements to create no issue of fact sufficient to stave off summary judgment. *See Flores v. Harbor Shipping & Trading Co.*, No. 01cv0738, 2001 WL 740509, at * 3 (E.D. La. Jun. 29, 2001) ("With respect to contractual disputes, the federal courts consistently hold that a party's failure to recall a relevant event is insufficient to raise an issue as to the occurrence *vel non* of that event"); *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 674 (10th Cir. 1998) (finding no genuine issue of material fact where plaintiff could not "remember when or exactly what was said"); *Chandler v. James*, 985 F. Supp. 1094, 1097 (M.D. Ala. 1997) (granting summary judgment: "the court does not believe that it is under an obligation to assume for purposes of summary judgment that an event did not occur, when, in response to the allegations of the Plaintiff, the Defendants' witness states that he or she does not remember whether the event took place or not. The court does not believe that this is a showing sufficient to 'negate [the plaintiff's] claims' and demonstrate the existence of a material issue of fact").

accounting when a parent corporation owns 80% or more of a subsidiary, as is the case here. *See* Plaintiffs' Response at 7. In an effort to wriggle away from the clear, undisputed record evidence regarding GAAP, Plaintiffs have flung at the Court a smorgasbord of arguments, each more contradictory and inaccurate than the last.

Initially, Plaintiffs argue that BNC's consistency with GAAP is "irrelevant," because "[t]his is not an action against an accountant for negligence in presentation of financial statements." Plaintiffs' Response at 4. But Plaintiffs' relevancy analysis is quickly discredited by their own pleadings. In the Amended Complaint, Plaintiffs repeat "mantra-like" in paragraphs 57, 58, 59, and 60 that BNC's actions were "in violation of GAAP." Clearly Plaintiffs have forgotten just how relevant they believe GAAP compliance to be.

Unable to credibly contend that GAAP is "irrelevant," Plaintiffs next argue that while an act may be consistent with a particular GAAP principle, "it *may well be* impermissible under another GAAP principle, or run afoul of securities law, or statute, or common law, or the terms of the parties agreement." Plaintiffs' Response at 5. Missing, however, is any relevant authority that the application of GAAP principles *encouraging* push-down accounting for this Put Option formula actually "ran afoul" of any other "GAAP principle" or "securities law, statute or common law."[6] Instead, Plaintiffs provide a page-long string cite of inapplicable cases, nearly all of which discuss GAAP compliance solely in the context of *fraud* claims, including two block quoted cases expressly limited in scope to "a securities *fraud* case." *U.S. v. Rigas*, 490 F.3d 208, 220 (2d. Cir. 2007); *see also In re Michaels Stores, Inc. Sec. Litig.*, No. 03cv0246, 2004 WL 2851782, at *4 (N.D. Tex. Dec. 10, 2004). Plaintiffs do not, and can not, identify a single GAAP principle, securities law, statute,

---

[6] Faced with testimony from their own expert admitting that the push-down was permitted and encouraged under GAAP, Plaintiffs attempt to scramble away from Professor Antle's testimony with a new affidavit from the Professor. Because the new affidavit is inconsistent with his prior deposition testimony, the Court should afford it no weight in Plaintiffs' attempt to avoid summary judgment. *See Trans-Orient Marine Corp. v. Star Trading & Marine, Inc.*, 925 F.2d 566, 572 (2d Cir. 1991) ("The rule is well-settled in this circuit that a party may not, in order to defeat a summary judgment motion, create a material issue of fact by submitting an affidavit disputing his own prior sworn testimony."); *Aspilaire v. Wyeth Pharm., Inc.*, No. 07cv0952, 2009 WL 988648, at *16 (S.D.N.Y. Mar. 30, 2009) (finding it "improper for the Court to consider" an "affidavit [that] contradicts plaintiff's deposition testimony").

common law analysis, or term of the parties' agreement that somehow negates the application of push-down accounting when used for the valuation of a subsidiary. Indeed, there is none.

Unable to establish that GAAP is "irrelevant," and unable to establish that push-down is "permissible" under GAAP but "impermissible" under "other principles," Plaintiffs next argue that push-down is actually "impermissible" under GAAP. In this regard, Plaintiffs actually dispute that their expert, Professor Antle, admitted that push-down accounting was permissible under GAAP for the purpose of valuation of subsidiaries. Plaintiffs claim that the "sole support for the supposed agreement" of Professor Antle can be found in one limited question and answer on pages 25 and 26 of his transcript. Plaintiffs' Response at 8.

We invite the Court to review pages 19 through 26 of the Antle transcript, where the breadth of Professor Antle's admissions are clear. There, Professor Antle admits that the "first thing" he would do as an expert is to "look for authoritative guidance" from the SEC on push-down accounting; and that he thought the SEC *had* given guidance on "if a parent was going to make a public offering of a subsidiary, then how the parent's debt was going to be handled on the subsidiary's books" — in other words, *how the subsidiary should be valued in light of the debt.* (Antle Depo. at 19-20). Plaintiffs admit — indeed, insist — that valuation of the subsidiary was the very purpose of the Put Option formula.

Professor Antle then said he "would need to see the exact rule" to see what the "guidance" was. When shown the "exact rule," an SEC Emerging Issues Task Force ("EITF") pronouncement, he eventually admitted that the guidance provided that push-down accounting *was permitted if 80 to 95 percent of a company was acquired*. Antle Depo. at 20-23 (emphasis added). Professor Antle then admitted that in the "hierarchy of rules" that he considers to GAAP, one would look to the EITF pronouncements such as the one he was shown. *Id*. at 23-24. He then testified with utter clarity:

> Q: In the context of a company that becomes substantially wholly-owned, you understand that push-down accounting is permitted if 80-95% of a company has been acquired?
>
> A: Yes.

*Id*. at 23.

Next, Professor Antle was shown another publication from Deloitte & Touche that embraced the EITF pronouncement and found the pronouncement to be equally applicable to non-SEC registrants. *Id*. at 25-26. And, in this regard, he was asked a final question: "Do you agree that current practice supports the acceptability of push-down accounting under those circumstances?" Professor Antle again testified in the affirmative.[7/]

Unable to show that GAAP was "irrelevant," or that push-down accounting was "permissible" but overridden by other "principles," or that Professor Antle actually said that push-down was "impermissible" under GAAP, Plaintiffs and Professor Antle now argue that push-down accounting in this instance was "inappropriate." Specifically, Professor Antle says in his new affidavit that because there is a "significant minority interest" at 20%, these "are circumstances which make push-down accounting *inappropriate*." Antle Affidavit ¶ 5. He notes that if Benihana had acquired 79.9% of Haru, push-down accounting would be prohibited under the SEC guidelines which he admits reflect GAAP.

Respectfully, there is no basis in law or in the record to support Professor Antle's new — and desperate — testimony. As the Court recognized, the question is whether the push-down accounting treatment was *permissible* in this case. *See Matsumura*, 542 F. Supp. 2d at 253 n. 10. The experts have recognized that there is a bright-line test at 80%. The record contains no regulations, statutes

---

[7/] In place of citing actual "authoritative guidance" or authority to support the notion that BNC's push-down was "inappropriate," Plaintiffs and Professor Antle argue (without authority) that BNC is somehow "double counting Benihana's side of the transaction." Antle Affidavit ¶ 3. Plaintiffs and the Professor, however, insist the transaction should be booked so that it ignores BNC's unilateral investment, *and Plaintiffs' receipt of over $8 million at the initial closing.* The purpose of the transaction was to provide Plaintiffs with $8 million up front, with the understanding that the value of Haru stock in 2005 (via the Put/Call Option) would be based on the actual value of the company as a going concern. The Agreement did not provide for two separate classes of stock, that owned by BNC and burdened with the purchase price debt, and that owned by Plaintiffs, unburdened by debt. Such a result would double count in Plaintiffs' favor.

As a final foray on this point, Plaintiffs argue that GAAP was irrelevant because the undersigned counsel noted at an earlier hearing that GAAP is not mentioned in the definition of "Amount of Company Debt." *See* Plaintiffs' Response at 21 n. 14. At that hearing, and in their pleadings, Plaintiffs have insisted that GAAP applied. They were correct. Indeed, discovery has revealed, and both experts agree, that GAAP provides guidance on the application of push-down accounting.

or guidance suggesting a sliding scale around the 80% line for the Court to determine that an otherwise permissible application is "appropriate" or "inappropriate." Indeed, if anything, the undisputed record reflects that push-down accounting is *encouraged* by the SEC staff when the parent owns 80-95% of a subsidiary. *See* Defendants' Statement of Material Facts ¶¶ 52-57 and Exs. P, Q and R; *see also* Plaintiffs' Response at 7.

Plaintiffs' demands for more "appropriate treatment" comporting with the unidentified "underlying principles of GAAP" to prevent "manifest unfairness" come to this Court unadorned by case authority or authoritative guidance. This latest position cannot save Plaintiffs from summary judgment.[8/]

Finally, Plaintiffs' fiduciary duty arguments fail because BNC's duties are established by the Stockholders' Agreement, not the fiduciary relationship. Plaintiffs fail to cite a single case in which a breach of fiduciary duty was found to exist based on conduct otherwise permissible under a stockholder's agreement. In fact, the law is to the contrary. For example, in *Cooper Development Co. v. Friedman*, No. 92cv7572, 1994 WL 62846 (S.D.N.Y. Feb. 22, 1994), the court granted summary judgment for a defendant on a breach of fiduciary duty claim based on defendants' actions that were in compliance with the terms of a contract:

> The fiduciary obligations owed by partners are defined by the partnership agreement. Even where a partnership agreement expressly authorizes self-dealing, its terms are enforceable and broad notions of fiduciary duty will not override its provisions. Therefore, where the partnership agreement expressly authorized defendant to enter into a competing venture, it cannot be a breach of duties under that agreement to do exactly what he was authorized to do.

*Id.* at *5 (citations omitted). *See also, e.g., In re Wet-Jet Int'l, Inc.*, 235 B.R. 142, 149-50 (Bankr. D. Mass 1999) (citations omitted) (since "there is no indication of any failure in the duty of good faith and fair dealing at the time that stockholder agreement [was] executed, issues of the breach of

---

[8/] Plaintiffs conclude their GAAP discussion by relying on inapposite dicta from the *In re Adelphia Commc'n Corp.* bankruptcy decision, 368 B.R. 140 (S.D.N.Y. 2007). In *Adelphia*, it appears that a set of parent-related debtors were attempting to use push-down accounting not to value a subsidiary, but rather to hopscotch the priority of a more senior debtor not in privity with that debt transaction. In this regard, Plaintiffs take one of the Court's several dozens of non-binding "observations" out of context.

fiduciary duty do not arise when one party simply seeks to exercise its rights under those agreements"); *In re Access Cardiosystems, Inc.*, No. 05-4076, 2009 WL 1044869, at *75 (Bankr. D. Mass. Apr. 17, 2009) (rejecting breach of fiduciary claim as a matter of law and finding that plaintiff "cannot argue that [Defendants] were constrained by fiduciary obligations to refrain from exercising their rights pursuant to the Stockholders' Agreement"); *In re Rockville Orthopedic Assocs., P.C.*, 377 B.R. 438, 445-46 (Bankr. D. Conn. 2007) (granting corporation's motion for summary judgment and rejecting notion that "compliance [with a contract's terms] could be deemed a breach of fiduciary duty"). BNC has abided by the terms of the Stockholders' Agreement, and cannot, as a matter of law, be subject to a claim for breach of fiduciary duty for doing so. Certainly, Plaintiffs cannot now claim that BNC's actions were "inherently unfair" when Plaintiffs themselves have contractually sanctioned BNC's course of action.

2. Pre-Closing, BNC Did Not Owe a Fiduciary Duty to Plaintiffs.

Plaintiffs' argument that "claims for *pre-closing* breaches of fiduciary duty should be resolved at trial" is without merit. Plaintiffs' Response at 13 (emphasis added). As is evident from the undisputed record evidence and the previous Order of this Court, BNC has clearly established as a matter of law that no breach of fiduciary duty occurred during the pre-closing period, when Plaintiffs were represented by counsel and there was no fiduciary relationship between Plaintiffs and BNC.[9] This Court has already held that prior to closing, Darwin Dornbush (BNC's counsel and

[9] Plaintiffs' case law does not aid their cause. *Manhattan Motorcars, Inc. v. Automobili Lamborghini, S.P.A.*, 244 F.R.D. 204 (S.D.N.Y. 2007), involved what the Court termed "the dependency inherent in the manufacturer/distributor relationship," creating "circumstances sufficiently extraordinary to allow [a] claim for breach of fiduciary duty." *Id.* at 219-20 (internal quotations omitted). Clearly, this case does not implicate the same extraordinary circumstances. Equally unavailing to Plaintiffs is their string of distinguishable case law involving the relationships between a director and corporation, a developer and condominium association, and a promoter and corporation, respectively. *See* Plaintiffs' Response at 15 (citing cases). Plaintiffs last cited case, *In re Louis Frey Co., Inc.*, No. 06cv7587, 2007 WL 924206 (S.D.N.Y. Mar. 26, 2007), is equally irrelevant in that it involves extreme breaches, including "misappropriat[ing] the Debtor's customer lists and customer-related information for their own benefit, [driving] the Debtor out of whatever business was left, and acquir[ing] the Debtor's valuable customer relationships for their own benefit to the detriment of the debtor and its creditors." *Id.* at *5. None of these breaches are of any relevance to this case.

Board member) recommended Plaintiffs hire separate counsel, thereby destroying any argument that Darwin Dornbush owed Plaintiffs a fiduciary duty. *See Matsumura*, 542 F. Supp. 2d. at 259. The Court also concluded that it would have been unreasonable, as a matter of law and fact, for Plaintiffs — experienced business people represented by skilled counsel — to rely on Dornbush's alleged statements purportedly explaining the application of the Put Price formula, as opposed to looking to the words of the Stockholders' Agreement itself:

> Here, plaintiffs are sophisticated entrepreneurs who built a successful restaurant franchise in one of the most challenging markets in the country and managed numerous other restaurant ventures . . . The parties negotiated the terms of the Haru acquisition for several months and the resulting Stockholders' Agreement was a complex, comprehensive and fully integrated contract. Over the course of their discussions, Benihana drew attention to the issue of the put price valuation by suggesting that "fair market value" was too "nebulous" and suggested a specific formula for calculating the put price, which was eventually incorporated into the Stockholders' Agreement . . . Benihana had certainly placed the plaintiffs on notice that the details of the put price valuation were of significant concern to them. If the plaintiffs had felt that the precise formula used in the Stockholders' Agreement was inartfully drafted or failed to account for their apprehensions about the imposition of debt and acquisition costs on Haru, they could have protected themselves by inserting appropriate language into that agreement. Morever, the merger clause reflects the parties' intention to make the Stockholders' Agreement complete and comprehensive.

*Id.* at 257.

## III. CONCLUSION

For the foregoing reasons and on the foregoing authorities, the Court should grant Defendants' motion for summary judgment.

Respectfully submitted,

STEARNS WEAVER MILLER WEISSLER
ALHADEFF & SITTERSON, P.A.

By:    s/Alan H. Fein
      Alan H. Fein (AF - 5569)
      Adam M. Schachter (AS - 5848)
      Museum Tower, Suite 2200
      150 West Flagler Street
      Miami, Florida 33130
      Telephone: (305) 789-3200
      Facsimile:  (305) 789-3395

*Attorneys for Defendants Benihana National Corporation and Haru Holding Corporation*

**CERTIFICATE OF SERVICE**

I hereby certify that on May 22, 2009, I electronically filed the foregoing Reply Memorandum of Law in Support of Defendants' Motion for Summary Judgment with the Clerk of Court using CM/ECF system which will automatically send e-mail notification of such filing to the following attorneys of record:

Alfred N. Metz, Esq.
DEUTSCH, METZ & DEUTSCH, LLP
18 East 41st Street, Sixth Floor
New York, NY 10017
Tel: (212) 684-1111
Fax: (212) 684-1113

*Attorneys for Plaintiffs*

s/Adam M. Schachter
ADAM M. SCHACHTER