UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X

MEI PING (BARBARA) MATSUMURA AND CARL
MILNER, AS TRUSTEE OF THE TRUST U/W/O
ARTHUR CUTLER,

                Plaintiffs,

  - against -

BENIHANA NATIONAL CORPORATION AND
HARU HOLDING CORPORATION,

                Defendants.
----------------------------------------X

**MEMORANDUM AND ORDER**

06 Civ. 7609 (NRB)

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

### I. Introduction

Presently before the Court are the parties' cross-motions for summary judgment on the factual issue remanded to us by the Second Circuit on March 5, 2012. For the following reasons, plaintiffs' motion is denied and defendants' motion is granted.

### II. Background

The factual background of this case is presented in our Memorandum and Order filed on March 5, 2010, see Matsumura v. Benihana Nat'l Corp., No. 06 Civ. 7609 (NRB), 2010 WL 882968, at *1-*4 (S.D.N.Y. Mar. 5, 2010), as well as the Second Circuit's decision of March 5, 2012, see 465 F. App'x 23, 24-27 (2d Cir. 2012). Therefore, we will set out here only that factual and procedural history necessary to provide context to our decision.

**A. Factual History**

In 1996, plaintiff Mei Ping (Barbara) Matsumura ("Matsumura") founded Haru, a New York City sushi restaurant chain, with Arthur Cutler, who died in 1997 and whose ownership interest in the enterprise passed into a trust of which plaintiff Carl Milner is the trustee. Defs.' Statement of Material Facts in Supp. of Mot. for Summ. J. ¶¶ 7-8 (Oct. 15, 2012) [hereinafter DSMF]; Pls.' Response to Defs.' Statement of Material Facts ¶¶ 7-8 (Nov. 5, 2012) [hereinafter PR-DSMF]. In 1999, defendant Benihana National Corporation ("Benihana"), an international restaurant chain, acquired an 80% interest in Haru. See Stockholders' Agreement Between Haru Holding Corp., Benihana Nat'l Corp., Mei Ping Matsumura, and Estate of Arthur Cutler (Dec. 6, 1999), Ex. F, Metz. Decl. (Oct. 1, 2012) [hereinafter SHA]. As part of the transaction, the parties executed a Stockholders' Agreement (the "SHA") on December 6, 1999, which provided plaintiffs with the following Put Option:

> At any time during the period commencing July 1, 2005 and ending on September 30, 2005, the Minority Stockholders shall have a one-time option ("Put Option") to sell to [Benihana], and to cause [Benihana] to purchase, all, but not less than all, of the Common Stock owned by the Minority Stockholders (including any transferees) in its entirety. Such option shall be exercised by delivering to [Benihana] a written notice (the "Put Notice") of exercise signed by all Minority Stockholders.

Id. § 3.1.   The SHA further provided that "[t]he purchase price for each share of Common Stock being sold by the Minority Stockholders pursuant to Section 3.1 shall be the Put Price," id. § 3.2, which was defined as follows: "(A) Four and One-Half (4 1/2) times (B) the Company's Consolidated Cash Flow for the Pricing Fiscal Year, from which total is subtracted (C) the Amount of Company Debt, which total is divided by (D) the number of shares of Common Stock outstanding as at the date of such computation."  Id. § 1.  Finally, the SHA provided:

> "Amount of Company Debt" means, as of the end of the Pricing Fiscal Year, the total of all indebtedness (including all accrued and unpaid interest) of the Company and its subsidiaries (including, without limitation, indebtedness to stockholders of the Company and, in the case of indebtedness to [Benihana], all accrued and unpaid interest thereof computed at the rate of interest charged to [Benihana] (or its parent, Benihana, Inc.) under their primary bank line of credit (which is, on the date hereof, with First Union National Bank)) other than accounts payable incurred in the ordinary course of business.

Id.  The transaction closed on December 6, 1999; in exchange for conveying to Benihana an 80% ownership interest in Haru, plaintiffs received $8,125,000, less expenses.  See id.; DSMF ¶¶ 42-43; PR-DSMF ¶¶ 42-43.  Also at closing, Matsumura entered into an employment contract pursuant to which she would serve as Haru's Vice President and Chief Operating Officer.  See Employment Agreement Between Haru Holding Corp. and Mei Ping Matsumura (Dec. 6, 1999), Ex. I, Defs.' Statement of Material

Facts in Supp. of Mot. for Summ. J. (Apr. 3, 2009), at BNC 0257-BNC 0266.

Haru operated successfully for a number of years under Benihana's majority ownership and Matsumura's management. During this time, Benihana maintained an "interdepartment" or "intercompany" line item in Haru's consolidated financial statements. Pls.' Statement of Material Facts ¶ 4 [hereinafter PSMF]; Defs.' Response to Pls.' Statement of Material Facts ¶ 4 [hereinafter DR-PSMF]. The interdepartment line was "increased" to reflect any debt owed by Haru to Benihana and "decreased" to reflect cash received by Haru that was upstreamed to Benihana. PSMF ¶ 5; DR-PSMF ¶ 5. As Benihana structured Haru's financials, Benihana "fronted" essentially all of Haru's expenses and Haru upstreamed all or substantially all of its cash to Benihana, such that the interdepartment line essentially reflected all of Haru's costs and revenues. See PSMF ¶ 5; DR-PSMF ¶ 5; Pls.' Mem. of Law in Supp. of Mot. for Summ. J. 3 & n.3 [hereinafter Pls.' MSJ].

Benihana recorded three major categories of debts on the interdepartment line: (1) Benihana's purchase price for Haru, (2) construction costs for new Haru restaurants, and (3) the costs of goods and services used in the day-to-day operations of the Haru restaurants, such as food, supplies, and payroll. See PSMF ¶ 5; DR-PSMF ¶ 5; Pls.' MSJ 3. When Benihana decreased the

interdepartment line to account for Haru's upstreamed cash, however, Benihana did not "match" individual lines of cash to individual lines of debt, but rather decreased the overall amount of debt by the amount of upstreamed cash.  Pls.' MSJ 3. In this way, the interdepartment line was treated as a "fungible account."  PSMF ¶ 5; DR-PSMF ¶ 5.

When the Put Option window opened in mid-2005, plaintiffs duly exercised their option.  DSMF ¶ 55; PR-DSMF ¶ 55.  Applying the Put Option formula set out in the SHA, Benihana determined that plaintiffs' shares were worth $3,717,996.20.  Matsumura v. Benihana Nat'l Corp., No. 06 Civ. 7609 (NRB), 2010 WL 882968, at *4 (S.D.N.Y. Mar. 5, 2010).  This calculation was based on an Amount of Company Debt of $9,114,782, which was the value of the interdepartment line at the time provided for in the formula. Id.  Plaintiffs, however, rejected Benihana's calculation, and thus the Put Option transaction was not consummated, Benihana placed $3,717,996.20 in escrow, and plaintiffs commenced the present litigation.  See id.

## B. Procedural History

Following cross-motions for summary judgment, on March 5, 2010, we issued a Memorandum and Order granting each motion in part and denying each motion in part, and, on October 18, 2010, we issued an Order determining that the value of the Put Option

was $3,796,706.52.[1]  Plaintiffs appealed these decisions, and, on March 5, 2012, the Second Circuit issued an order affirming our decisions in part and vacating them in part.  See Matsumura v. Benihana Nat'l Corp., 465 F. App'x 23 (2d Cir. 2012).  Although the Circuit upheld most of our conclusions, it held that we "erred by granting summary judgment to [Benihana] on Plaintiffs' breach of contract claim insofar as the claim is predicated on the inclusion of day-to-day business expenses of Haru (such as expenses for food and payroll) in the 'Amount of Company Debt.'" Id. at 28.

In our Memorandum and Order of March 5, 2010, we had reasoned that, although it "could in theory constitute a breach of contract" for Benihana to include debts for food, supplies, and payroll in Amount of Company Debt, "the undisputed facts of this case make it clear that Haru's 'Amount of Company Debt' did not ultimately include charges for these regular operating items."  Matsumura v. Benihana Nat'l Corp., No. 06 Civ. 7609 (NRB), 2010 WL 882968, at *7 (S.D.N.Y. Mar. 5, 2010).  Citing what we construed as a concession by plaintiffs' counsel, we found that the "system of debiting and crediting the interdepartment line cancelled itself out over time, leaving no

---

[1] The reason for the discrepancy between the value of the Put Option as determined in our Memorandum and Order of October 18, 2010 ($3,796,706.52) and the value of the Put Option as calculated by Benihana ($3,717,996.20) is that we determined that Benihana had improperly included $393,551.61 of legal and banking expenses in "Amount of Company Debt," thereby undervaluing the Put Option by one-fifth of that amount, or $78,710.32.

net effect on the amount of Haru's debt." Id. at *7 (citing Oral Argument Tr. 5 (Jan. 14, 2010)).

The Second Circuit disagreed with our interpretation of plaintiffs' counsel's statement, finding that counsel had "merely acknowledged that day-to-day business expenditures were made by [Benihana] and that day-to-day business proceeds were paid to it, without conceding that these two amounts cancelled each other out."[2] Matsumura, 465 F. App'x at 29. Accordingly, the Circuit remanded the case to us "so that it may be determined, as a factual matter, whether the amount of day-to-day business expenses carried by Haru as interdepartmental debt was indeed canceled out by Haru's 'upstreaming' of revenue to [Benihana]." Id.

Following the Circuit's ruling, plaintiffs moved for summary judgment and for attorney's fees and costs, and defendants moved for attorney's fees and costs. On June 12, 2012, we issued an Order finding these motions premature and accordingly denying them "without prejudice to their renewal once the scope and nature of the recent remand is clarified." Matsumura v. Benihana Nat'l Corp., No. 06 Civ. 7609 (NRB) (S.D.N.Y. June 12, 2012). Subsequently, plaintiffs filed a

---

[2] Despite arguing to the Second Circuit that we had mischaracterized their counsel's statement at oral argument, see Br. for Pls.-Appellants, Matsumura, 465 F. App'x 23 (No. 10-4258-cv), 2011 WL 682878 at *42 & n.17, plaintiffs never requested that we reconsider our decision of March 5, 2010, based on that misunderstanding.

motion for leave to renew their previously filed motion for summary judgment, which we denied on the record on September 13, 2012, because the motion for summary judgment relied on a new expert affidavit even though the Circuit had not reopened the factual record and even though the expert had merely made calculations and arguments that counsel could have made.  See Oral Argument Tr. 6-7 (Sept. 13, 2012) (citing Chin v. Port Auth. of New York & New Jersey, 685 F.3d 135, 160-61 (2d Cir. 2012)).  Nonetheless, we granted each side leave to file a motion for summary judgment that did not rely on an expert affidavit.  See id. at 7, 18; see also Matsumura, No. 06 Civ. 7609 (NRB) (S.D.N.Y. Sept. 18, 2012).  The parties proceeded to file cross-motions for summary judgment, with plaintiffs arguing that "approximately $5.5 million" in accounts payable fronted by Benihana remained unpaid as of March 27, 2005,  Pls.' MSJ 1, and defendants arguing that no accounts payable remained unpaid, Defs.' Mem. of Law in Supp. of Mot. for Summ. J. and in Opp'n to Pls.' Mot. for Summ. J. 1.  We held oral argument on June 6, 2013.

### III. Discussion

### A. Legal Standard

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriately granted when "there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In this context, "[a] fact is material if it might affect the outcome of the suit under the governing law, and an issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Ramos v. Baldor Specialty Foods, Inc., 687 F.3d 554, 558 (2d Cir. 2012) (quoting Niagara Mohawk Power Corp. v. Hudson River-Black River Regulating Dist., 673 F.3d 84, 94 (2d Cir. 2012)) (internal quotation marks omitted). When making this determination, "we are required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." Donnelly v. Greenburgh Cent. Sch. Dist. No. 7, 691 F.3d 134, 141 (2d Cir. 2012) (quoting Terry v. Ashcroft, 336 F.3d 128, 137 (2d Cir. 2003)) (internal quotation marks omitted).

On a motion for summary judgment, "[t]he moving party bears the initial burden of demonstrating 'the absence of a genuine issue of material fact.'" F.D.I.C. v. Great Am. Ins. Co., 607 F.3d 288, 292 (2d Cir. 2010) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). Where that burden is carried, the nonmoving party "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." Id. (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986)). The non-moving party "must do more than

simply show that there is some metaphysical doubt as to the material facts," <u>Brown v. Eli Lilly & Co.</u>, 654 F.3d 347, 358 (2d Cir. 2011) (quoting <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986)) (internal quotation marks omitted), and "may not rely on conclusory allegations or unsubstantiated speculation," <u>id.</u> (quoting <u>Great Am. Ins. Co.</u>, 607 F.3d at 292) (internal quotation marks omitted).

## B. Analysis

As discussed above, the question before us on remand is the narrow factual issue of "whether the amount of day-to-day business expenses carried by Haru as interdepartmental debt was indeed canceled out by Haru's 'upstreaming' of revenue to [Benihana]." <u>Matsumura v. Benihana Nat'l Corp.</u>, 465 F. App'x 23, 29 (2d Cir. 2012). Plaintiffs argue that we should answer this question in the negative and, in particular, that we should find that "approximately $5.5 million of the $9.1 million in the 'interdepartment' account as at 3/27/2005 is comprised of 'accounts payable,' and that plaintiffs should therefore have been paid, and should now be awarded, an additional $1.1 million for their 20% stake in Haru." Pls.' MSJ 1.

Plaintiffs' position is predicated on the method Benihana used to record the expenses and earnings of Haru.[3] Specifically,

---

[3] It is worth noting that the issue here is not simply whether Haru's expenses were paid for in reality; indeed, plaintiffs do not dispute that the day-to-

plaintiffs rely on the following presumption in New York law (the "New York presumption"): "Where a payment is made upon general account with no direction as to its application, the law applies it to the oldest items.  That is, the first debits are to be charged against the first credits and the debt paid according to priority of time."[4]  Pls.' MSJ 8 (quoting <u>Nat'l Park Bank v. Seaboard Bank</u>, 114 N.Y. 28, 35 (1889)); <u>see also</u> <u>Carson v. Fed. Reserve Bank of New York</u>, 254 N.Y. 218, 232 (1930) (holding that the presumption that "the successive payments and credits are to be appropriated in discharge of the items of debt antecedently due in the order of time in which they stand in the account, the first payments out extinguishing the first payments in," is "expressive of a rule that must prevail in the absence of persuasive reasons for qualification or exception"). Further, plaintiffs quote the Second Circuit's observation that "it has been held that a general credit to a running account is the equivalent of an election by the creditor to apply the payments to the extinguishment of the earlier items."  Pls.' MSJ 8 (quoting <u>Maryland Cas. Co. v. Bd. of Water Comm'rs of City of Dunkirk</u>, 66 F.2d 730, 738 (2d Cir. 1933)).  This presumption is subject to the exception that it "will be subordinated to the

---

day expenses of Haru were actually paid.  <u>See</u> Oral Argument Tr. 10-12 (Sept. 13, 2012).

[4] Notably, plaintiffs did not assert arguments based on the New York presumption in their original motion for summary judgment; such arguments appeared for the first time in their briefs on remand.

broader principle that an application, usually appropriate, may be varied by the court when variance is necessary to promote the ends of justice." Carson, 254 N.Y. at 232; see also Beyer Bros. of Long Island Corp. v. Kowalevich, 454 N.Y.S.2d 444, 445 (App. Div. 2d Dep't 1982) ("When neither the debtor nor the creditor makes such an application, the court will make it as equity and justice require, and, usually, the funds will be applied to the debts in the order of time in which they stand in the account. This application by priority of time will only be changed if persuasive reasons exist." (citations omitted)).

Here, plaintiffs argue, the fact that Benihana applied cash upstreamed from Haru to decrease the interdepartment line as a whole, instead of matching revenues with particular debts, shows that Benihana intended to pay down the earliest debts first, or at least that the parties did not clearly elect any particular application of revenues to debts. Pls.' MSJ 9-10. In light of this, and the fact that, according to plaintiffs, no countervailing circumstances require an exception to the New York presumption, id. at 11-15, plaintiffs urge us to apply that presumption and find that the debts in the interdepartment line were paid back in the order in which they were incurred, id. at 16. Under this approach, the $9,114,782 balance of the intercompany line would have consisted of the last-incurred debts up to a total of $9,114,782. Id. at 16. Working backward

from the most recently recorded expense, plaintiffs calculate that $5.5 million of the outstanding debt consisted of accounts payable in the ordinary course of business, which should have been excluded from Amount of Company Debt.  Id.

    This argument is unconvincing, as it turns a blind eye to both the parties' intent in entering into the SHA and the reasons why Benihana chose to employ the interdepartment line. As discussed below, a more plausible interpretation of the SHA is that, for purposes of the Put Price formula, the parties intended that cash upstreamed from Haru in the ordinary course of business would first cancel out accounts payable and then would, to the extent a balance remained, pay down Haru's long-term debt.  Under this approach, as of the date specified in the Put Price formula, all of Haru's accounts payable had indeed been cancelled out by upstreamed cash.

### 1. The Parties' Intent in Entering into the SHA

    In any contract case, our focus is on the intent of the parties in entering into the contract at hand.  See Greenfield v. Philles Records, Inc., 98 N.Y.2d 562, 569 (2002).[5]  Here, it does not appear from the record that the parties reached any explicit agreement regarding how Haru's debts would be accounted for in determining Amount of Company Debt for purposes of

---

[5] The SHA is governed by New York law.  See SHA § 8.7; Matsumura v. Benihana Nat'l Corp., No. 06 Civ. 7609 (NRB), 2010 WL 882968, at *1 n.4 (S.D.N.Y. Mar. 5, 2010).

calculating the Put Price.  However, as the following analysis of each side's incentives in entering into the SHA makes clear, plaintiffs' theory is inconsistent with the parties' interests at the time of contracting.

### a. Plaintiffs' Intent

First, it is inconceivable that plaintiffs would have intended the Put Price to turn on how Benihana happened to structure Haru's financials.  As both sides agreed at oral argument, there is no evidence in the record that the parties to the SHA had come to any sort of agreement or understanding regarding how Haru's debts would be accounted for.  See Tr. 4-5[6]; see also Pls.' MSJ 5.  Although both sides agreed that "there was a common understanding that Benihana would be paying [Haru's] expenses," Tr. 6, there was apparently no common understanding regarding whether Benihana would employ the interdepartment line accounting system which it ultimately used or whether it would employ a different accounting system, such as recording long-term debts in a separate account from accounts payable and, as cash was upstreamed from Haru, delineating which particular debts were being "paid back," see id. at 5.  In the absence of such an agreement, as plaintiffs freely conceded at oral argument, Benihana had complete discretion regarding the

---

[6] Citations to "Tr." refer to the transcript of the oral argument held on June 6, 2013.

accounting treatment it employed for Haru's debts and revenues.[7]
See Tr. 14 ("Benihana had a range of choices about how to do the
accounting as between it and Haru, and they picked one, they
didn't pick another or another or another.").

Plaintiffs place great weight on the fact that, in
exercising its discretion to choose an accounting system for
Haru, Benihana chose to treat the interdepartment line as an
undifferentiated account and to apply upstreamed cash against
overall debt rather than against discrete, individual debts.
From this fact, plaintiffs ask us to infer that the parties
intended to follow the New York presumption and to apply
upstreamed cash to pay back debts in the order incurred.
However, had Benihana instead recorded accounts payable in one
account and long-term debt (including the Haru purchase price
and construction costs) in a separate account, there is no
serious question that, as a matter of accounting, accounts
payable would have been cancelled out first and revenue net of
accounts payable, or some portion thereof, would have been
credited toward paying down the long-term debt. Indeed,
plaintiffs conceded at oral argument that "[their] argument

---

[7] Plaintiffs clarified at oral argument that Benihana was obligated to comply
with the Put Price formula. Tr. 12. However, this does not change the fact
that, during the period between the parties' execution of the SHA and
plaintiffs' exercise of the Put Option -- the period plaintiffs focus on in
arguing that the New York presumption applies -- Benihana had complete
discretion regarding the accounting system to employ for Haru's debts.

about how the debt ought to be calculated turns on the fact that Benihana kept [a] running undifferentiated Haru account." Tr. 12. In short, plaintiffs' theory is possible only insofar as we can infer which of Haru's debts were "cancelled out" from how Benihana chose to structure Haru's internal accounting.

We cannot reasonably draw such an inference. Plaintiffs, experienced businesspersons represented by counsel in their negotiations with Benihana, could not have intended that the Put Price be a function of an arbitrary accounting decision wholly within Benihana's discretion. Rather, they must have intended the Put Price to have some more objective value. The most natural way to determine the components of the Put Price formula which is not subject to how Benihana structured Haru's internal financials is to account for Haru's debts like those of any normal business: accounts payable are paid back by revenues in the ordinary course of business and the balance is credited toward paying down long-term debt. Indeed, it is sensible to presume that this is how plaintiffs expected Haru's debts to be accounted for, given that, at the time of contracting, plaintiffs and Benihana had not agreed on any other method of accounting for Haru's debts. By excluding accounts payable from Amount of Company Debt, plaintiffs did not intend to exclude a substantial portion of Haru's outstanding debt, but rather sought to simplify the calculation and insulate it from day-to-

day fluctuations by excluding de minimis amounts of accounts payable that had not yet been covered by Haru's revenues.

### b. Benihana's Intent

Plaintiffs' theory is inconsistent not only with their own incentives in entering into the SHA, but also with the incentives facing Benihana. Benihana's CEO, Joel Schwartz, described his primary goal in negotiating plaintiffs' Put Option as follows: "I want to get our return of investment before we were going to pay back." Schwartz Depo. 41:4-5, Ex. C, Metz Decl. (Oct. 1, 2012); see also Schwartz Depo. 33:20-22, Ex. E, DSMF ("I wanted to be sure that we had a return on investment first and that's how the put . . . was determined."). When Mr. Schwartz was asked to elaborate on the components of Benihana's investment in Haru that he wanted to be paid back, he explained:

> Well, anything that was in there. The cost of building restaurants and any other cost that we were –– here was, you know, a 20 percent partner and we were putting up all of the money so we would want that back before they leave and we get everything back. They weren't putting any dollars in. Any kind of work they were doing as an officer, as a director or operation they were getting paid and received stock options, etcetera.

Schwartz Depo. 41:18-25, Ex. C, Metz Decl. (Oct. 1, 2012). From this testimony, it appears that Benihana's primary objective in negotiating plaintiffs' Put Option was to incentivize Matsumura

to operate Haru efficiently and thus generate sufficient revenues to cover all of the expenses that Benihana fronted.[8]

Given this objective, Benihana could not have intended the New York presumption to apply. Under the Put Price formula, Matsumura had an incentive to minimize Amount of Company Debt but no incentive to minimize accounts payable in the ordinary course of business, which were excluded from Amount of Company Debt. If accounts payable were allowed to build up and reach into the millions of dollars, this incentive structure would have been a problem for Benihana, and would have undermined Mr. Schwartz's expressed objective of getting Benihana's investment in Haru paid back, because a significant portion of Benihana's investment could have remained unpaid without any adverse consequence for plaintiffs. In other words, Matsumura would not have been incentivized to ensure that Haru's revenues covered all of its debts to Benihana because those debts that were classified as accounts payable would have had no effect on the

---

[8] Plaintiffs argue that Benihana's "investment" in Haru, which Schwartz wanted to ensure was paid back, was limited to the purchase price and construction costs. Pls.' MSJ 13-14. However, this argument is inconsistent both with Schwartz's testimony that the "investment" he referred to included "anything that was in there" and with the obvious incentives facing Benihana. Given that Benihana fronted Haru's day-to-day expenses just as it fronted the cost of constructing new restaurants, there appears to be no reason, and plaintiffs have not persuasively pointed to one, why Benihana would prioritize getting paid back on its purchase and construction outlays over getting reimbursed for its fronting of Haru's day-to-day expenses. Moreover, in light of the structure of the Put Price formula, it would make no sense for Benihana to want upstreamed cash to cancel out the purchase price and construction costs, which operated to reduce the Put Price, before day-to-day accounts payable, which had no effect on the Put Price.

Put Price.   Yet, this is precisely the result of applying the New York presumption.   Indeed, as plaintiffs have applied the New York presumption here, "approximately $5.5 million" in accounts payable fronted by Benihana and recorded as debts in the intercompany account remained unpaid as of March 27, 2005. Pls.' MSJ 1.   It is simply not plausible, in light of Mr. Schwartz's testimony and common sense business realities, that Benihana intended to allow $5.5 million in fronted accounts payable to accumulate and for Matsuura to have no incentive to ensure that Haru paid back this debt.

Another way in which plaintiffs' theory is inconsistent with Benihana's interest in incentivizing Matsumura is that, as discussed above, the Put Price value under this theory would depend on how Benihana chose to exercise its discretion in the accounting treatment of Haru's debts.   Under plaintiffs' theory, therefore, the Put Option would not provide an effective incentive to Matsumura because the reward Matsumura received for her effort would be unpredictable and subject to the unchecked discretion of Benihana.

Rather than intending the New York presumption to apply, Benihana must have intended for cash upstreamed in the ordinary course of business first to cancel out accounts payable and then to pay down long-term debt, to the extent a balance remained. This approach would further Benihana's interest in incentivizing

Matsumura to operate Haru efficiently, as Matsumura would have an interest in ensuring that Haru's revenues covered fronted accounts payable as well as the purchase price and fronted construction costs.  Moreover, the incentive scheme provided under this approach would be more effective than the incentive scheme under the New York presumption because the reward Matsumura would receive for her effort would be more predictable and would be independent of how Benihana exercised its discretion in setting up Haru's accounting.  Finally, like plaintiffs, Benihana must have understood the exclusion of accounts payable from Amount of Company Debt to entail simply excluding de minimis accounts payable that had not yet been covered by upstreamed cash, thus simplifying the calculation and insulating it from day-to-day fluctuations.  Indeed, as discussed above, it would have been plainly contrary to Benihana's interests if accounts payable had been allowed to build up to any substantial level.

In short, to determine Amount of Company Debt in a manner dependent on how Benihana happened to structure Haru's internal accounting, and in particular to employ the New York presumption, is inconsistent with the interests of both plaintiffs and Benihana in entering into the SHA.  Therefore, to apply the New York presumption would be inequitable.  Instead, the above analysis of each side's interests in entering into the

SHA supports the conclusion that the parties intended that cash upstreamed in the normal course of business would cancel out accounts payable first and then, to the extent a balance remained, would pay down long-term debt.

### 2. Benihana's Reasons for Employing the Intercompany Line

In addition to being inconsistent with the parties' interests in entering into the SHA, the New York presumption also fails to reflect Benihana's reasons for employing the interdepartment line.  As plaintiffs conceded at oral argument, it was within Benihana's discretion to employ a differentiated accounting system for Haru in which accounts payable and accounts receivable were recorded in one account and the balance of that account was transferred to a second account holding long-term debt, such as the purchase price and construction costs.  See Tr. 15.  Under such an accounting system, assuming that revenues exceeded accounts payable, as Benihana clearly expected in purchasing Haru and as was borne out in reality, the balance of the long-term debt account would be the same as the balance of the interdepartment line that Benihana in fact maintained.  See Tr. 16-17.  Of course, the balance of the long-term debt account in the differentiated system would unquestionably have reflected Amount of Company Debt under the Put Price formula.

When Benihana was deciding which accounting system to employ for Haru, it surely understood all this, and probably reasoned that the interdepartment line system would not only operate equivalently to the differentiated system, with the interdepartment line balance equivalent to and equally reflective of Amount of Company Debt as the differentiated long-term debt account balance, but would also be simpler and easier to manage.[9]  By contrast, plaintiffs' suggestion that Benihana's use of the interdepartment line signaled its intent to employ the New York presumption is not only strained and without evidentiary support, but also implausible.  If the New York presumption applied, not only would the value of the interdepartment line fail to correspond to Amount of Company Debt, but also, for the reasons discussed above, Matsumura would not be incentivized to operate Haru efficiently.  In short, the New York presumption is inconsistent with Benihana's intent in choosing to use the interdepartment line; the only plausible explanation for Benihana's decision is that the interdepartment line system was intended to operate equivalently to a differentiated account system.  As would have been the case under a differentiated system, in the interdepartment line that

---

[9] The fact that, when plaintiffs exercised their Put Option, Benihana used the balance of the intercompany line as the Amount of Company Debt for purposes of determining the Put Price also suggests that Benihana understood the intercompany line to operate equivalently to a differentiated long-term debt account.

Benihana employed, the cash upstreamed in the ordinary course of business first cancelled out accounts payable, and the balance was then credited toward paying down long-term debt.

### 3. Resolution of the Issue on Remand

Our task on remand is to "determine[], as a factual matter, whether the amount of day-to-day business expenses carried by Haru as interdepartmental debt was indeed canceled out by Haru's 'upstreaming' of revenue to [Benihana]." Matsumura v. Benihana Nat'l Corp., 465 F. App'x 23, 29 (2d Cir. 2012). As discussed above, applying the New York presumption here would be inequitable because the presumption is inconsistent with the intent of the parties in entering into the SHA and with Benihana's intent in employing the interdepartment line system. Instead, the most plausible method of accounting for Haru's debts, in light of the parties' intent, is to deem cash upstreamed in the ordinary course of business first to have cancelled out accounts payable and then, to the extent a balance remained, to have paid down the purchase price and construction costs.

Because Haru was undeniably a profitable company, its upstreamed cash did, in fact, regularly cancel out its accounts payable. Further, given that Amount of Company Debt was calculated "as of the end of the Pricing Fiscal Year," SHA § 1, we can reasonably conclude that, as of that date, the cash

"corresponding to" the last-incurred accounts payable had been upstreamed and had cancelled out the accounts payable. Therefore, we answer the question on remand in the affirmative: the amount of day-to-day business expenses carried by Haru as interdepartmental debt was indeed canceled out by Haru's "upstreaming" of revenue to Benihana.

## IV. Conclusion

For the reasons stated above, plaintiffs' motion for summary judgment is denied and defendants' motion for summary judgment is granted. The parties shall submit a form of judgment consistent with this opinion within one week. This Memorandum and Order addresses docket entry nos. 123 and 127.


**SO ORDERED.**


Dated:    New York, New York
          July 9, 2013

                              _____
                              NAOMI REICE BUCHWALD
                              UNITED STATES DISTRICT JUDGE

Copies of the foregoing Memorandum and Order have been mailed on this date to the following:

Counsel for Plaintiffs:

Alfred N. Metz, Esq.
Deutsch, Metz, & Deutsch, LLP
18 East 41st Street, 6th Floor
New York, NY 10017

Counsel for Defendants:

Alan H. Fein, Esq.
Adam M. Schachter, Esq.
Stearns Weaver Miller Weissler Alhadeff & Sitterson, P.A.
Museum Tower, Suite 2200
150 West Flager Street
Miami, FL 33130